*Decision will be entered under Rule 50.*

---

JORDAHL & COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59581. Promulgated May 27, 1937.

*Richard S. Holmes, Esq., Harvey L. Rabbitt, Esq.,* and *David A. Buckley, Jr., Esq.,* for the petitioner.
*Daniel A. Taylor, Esq.,* for the respondent.

OPINION.

Sᴍɪᴛʜ: This proceeding involves deficiencies in petitioner's income tax for 1927 and 1928 in the amounts of $13,394.61 and $12,664.18, respectively. There are four major issues involved—(1) gain or loss on the sale of assets; (2) losses on match transactions; (3) amortization of patents; and (4) gain on exchange of assets for petitioner's own capital stock. The fourth issue is raised by an affirmative plea in the respondent's amended answer. There are also several collateral issues which will be set forth below.

The petitioner was incorporated in the State of New York on November 19, 1919, under the name of American Kreuger & Toll Corporation. In 1927 its name was changed to "Jordahl & Company, Inc." During the taxable years involved the petitioner was engaged in the business of importing chemicals, steel, scientific instruments, matches, and other products, and in holding stocks of subsidiary corporations. Until 1927 all of the petitioner's stock stood in the name of Ivar Kreuger. Kreuger served as president from the date of petitioner's organization until December 28, 1925, when he was succeeded by Anders Jordahl.

*Issue 1.—Gain or Loss on Sale of Assets.*

Pursuant to an agreement entered into between Anders Jordahl and Ivar Kreuger in November 1927, the petitioner during that year sold all of the capital stock of three of its subsidiary corporations, the Midwest Steel & Supply Co., hereinafter referred to as Midwest Co.; Akatos, Inc., formerly known as C. P. Chemical &

Drug Co.; and Deutsche Kahneisen Gesellschaft, a German corporation, hereinafter referred to as the D. K. Co.

The sale of the stock of the Midwest Co. carried with it the sale of the stock of two other subsidiary corporations, Midwest Air Filters, Inc., and Holly Pneumatic Systems, Inc.

The transaction was recorded in petitioner's books by a journal entry charging the account of petitioner's president, Jordahl, with $680,757.21 representing the purchase price of all the assets. This figure included an amount of $30,088.92 representing an indebtedness of the Midwest Co. for moneys advanced to it by the petitioner. The amount charged to Jordahl's account, $680,757.21, was later paid to the petitioner by Kreuger.

The facts and discussion regarding the petitioner's gain or loss on the several assets will appear below under separate subheadings.

### (a)—Midwest Steel & Supply Co. Stock.

The parties agree that the selling price of the Midwest Co. stock was $300,000, but they disagree as to its cost. In his deficiency notice the respondent has determined that the cost of such stock to the petitioner was $275,000 and that the petitioner realized a profit of $25,000 on its sale. In this proceeding the respondent pleads affirmatively that petitioner's net income as determined in the deficiency notice should be increased by $216,496.75, representing the amount of the operating net losses of the Midwest Co. and its subsidiaries for the prior years 1921 to 1927, inclusive, which were claimed and allowed as deductions in consolidated income tax returns filed by the petitioner and its affiliates for such years. In other words, the respondent now contends that the petitioner realized, instead of a profit of $25,000 as determined in the deficiency notice, a profit of $241,496.75 on the sale of the Midwest Co. stock.

Altogether, there were 5,000 shares of the Midwest Co. stock. The petitioner acquired 1,250 of those shares from the Midwest Co. on October 15, 1920, for which it credited that company's account with $125,000 representing the par value of such shares. It acquired from Ivar Kreuger 2,250 shares on October 30, 1920, for which it credited his account with $225,000, and 1,500 additional shares on December 31, 1923, for which it credited his account with $150,000.

The evidence before us is not clear as to the details of these transactions. According to the petitioner's books the Midwest Co.'s indebtedness to it on October 15, 1920, was less than $10,000. At the end of 1921, however, the Midwest Co.'s account showed a debit balance of over $74,000, after allowing for the credit of $125,000 in 1920.

The petitioner's capital account in 1920 showed bills receivable from Kreuger in the amount of $1,675,000; real estate, $3,000,000; and cash, $1,325,000. At the end of 1923 Kreuger's account showed a debit balance of $434,385.57. In 1932 the petitioner's books showed a balance of $278,903.96 in Kreuger's favor.

These facts indicate that the petitioner paid par value for all of the Midwest Co.'s shares. The oral evidence adduced at the hearing supports this conclusion. We therefore find that the cost to the petitioner of the 5,000 shares of Midwest Co. stock was $500,000.

The further question remains as to what treatment is to be accorded the operating losses of the Midwest Co. and its subsidiaries in prior years which were deducted from gross income in the consolidated returns filed by the petitioner and its affiliated companies.

Net losses of the Midwest Co. and its subsidiaries were availed of to reduce the consolidated net income of the petitioner and its affiliates for the years 1921 to 1927, inclusive, as follows:

| Name of corporation | Year | Amount |
|---|---|---|
| Midwest Steel & Supply Co | 1921–1926 | $111,795.20 |
| Midwest Steel & Supply Co | 1927 | 40,088.96 |
| Midwest Air Filters, Inc | 1927 | 22,032.65 |
| Holly Pneumatic Systems, Inc | 1926–1927 | 42,579.94 |
| Total | | 216,496.75 |

Petitioner contends, however, that it was not affiliated with the Midwest Co. until December 31, 1923, and that the operating losses of the Midwest Co. for 1924, 1925, 1926, and 1927 only may be used to reduce the loss on the sale of the Midwest Co. stock.

This contention is without merit. It is now well settled that the loss on the sale of the stock or liquidation of a subsidiary company must be reduced by the amount of the subsidiary's operating losses which were availed of to reduce the taxable income of the affiliated group. *Ilfeld Co.* v. *Hernandez*, 292 U. S. 62; *McLaughlin* v. *Pacific Lumber Co.*, 293 U. S. 351; *Commissioner* v. *National Casket Co.*, 78 Fed. (2d) 940; *Greif Cooperage Corporation* v. *Commissioner*, 85 Fed. (2d) 365. In *Ilfeld Co.* v. *Hernandez, supra,* the Court said:

3. The allowance claimed would permit petitioner twice to use the subsidiaries' losses for the reduction of its taxable income. By means of the consolidated returns in earlier years it was enabled to deduct them. And now it claims for 1929 deductions for diminution of assets resulting from the same losses. If allowed, this would be the practical equivalent of double deduction. In the absence of a provision of the Act definitely requiring it, a purpose so opposed to precedent and equality of treatment of taxpayers will not be attributed to lawmakers. * * *

Again, in *McLaughlin* v. *Pacific Lumber Co., supra,* the Court said that "Losses of Thane & Co. [the subsidiary] that were subtracted

from respondent's [the parent company's] income are not directly or indirectly again deductible." On the reasoning of the Supreme Court in those cases it is unnecessary to inquire, and it is doubtful whether it could be satisfactorily determined on the evidence before us, whether the corporations here properly filed consolidated returns in the years when the operating losses of the Midwest Co. were availed of to reduce the net income·of the alleged affiliated group. The reason for the denial of the deductions claimed in the cited cases loses none of its force because of the fact that error may have been committed in the filing of the consolidated returns for the prior years and in the allowance of the subsidiary's operating losses in such returns. In *Summerfield Co.*, 29 B. T. A. 77, decided before the Supreme Court's decisions in the cases cited above, we considered this angle of the question, saying:

\* \* \* During the previous period of affiliation the consolidated income was offset by operating losses of the Taylor Co. totaling $155,581.19. Respondent maintains that the loss sustained at liquidation upon open account must be reduced by that amount, citing *Riggs Nat. Bank*, 17 B. T. A. 615; affd., 57 Fed. ·(2d) 980; *Burnet* v. *Aluminum Goods Co.*, 287 U. S. 544; *Hernandez* v. *Ilfeld*, 66 Fed. (2d) 236. With that we agree. Petitioner cannot deny that during these prior years it was treated as affiliated—whether rightly or not we need not decide—and that it obtained a benefit from that affiliation through the reduction of its taxable income on account of the operating losses of its then subsidiary. To hold that it may now deduct the advances in their entirety would be to allow a second time the amounts deducted during the period of affiliation. That is contrary to our understanding of the view expressed in the cases above cited. \* \* \*

Since the aggregate of the operating losses of Midwest Co. for the years 1921 to 1927, inclusive, availed of to reduce the net taxable income of the petitioner and other companies with which it joined in filing consolidated returns, is greater than the excess of the cost of the Midwest Co. shares over their selling price, no loss is allowable to the petitioner on the sale of the Midwest Co. shares in 1927. In his amended pleadings the respondent contends affirmatively that the petitioner realized a taxable gain on the sale of the Midwest Co. stock measured by the difference between the original cost thereof, reduced by the amount of the operating losses deducted in the consolidated returns, and the selling price. This contention is likewise without merit. *Ilfeld Co.* v. *Hernandez*, *supra*, and the other cases cited above deal only with loss deductions. There is no implication that the rule therein stated is to govern in the computation of a taxable gain to the parent corporation. The necessity for the rule restricting the loss deductions, as the court pointed out, is to prevent a parent corporation from twice deducting the losses of a subsidiary corporation.

In *Burnet* v. *Riggs National Bank*, 57 Fed. (2d) 980, the court said:

On the other hand, we are convinced that the Board of Tax Appeals was right in refusing to allow the claim of the Riggs Bank for the *entire loss* as at the time of the liquidation, because of the fact that a part of this loss had been deducted by the bank in its return for the first part of the year 1922. To allow the entire loss as of June 10, 1922, would have resulted in respondent receiving credit twice for a part of the loss. * * * [Italics supplied.]

It is to be noted that the court refers to the "entire loss." This must mean the loss sustained on the liquidation of the subsidiary without regard to the operating losses previously deducted. In other words, the "entire loss" is computed in the ordinary manner, without any adjustment of the base, but that part of the loss which has been previously deducted as an operating loss is not again allowable as a capital loss.

In *Remington Rand, Inc.* v. *Commissioner*, 33 Fed. (2d) 77, cited in *Ilfeld Co.* v. *Hernandez, supra*, the court held that a subsidiary company's accumulated earnings could not be added to the cost of the stock in determining the parent company's taxable gain on its sale to outside interests. As a corollary the subsidiary's losses should not be subtracted from the cost of the stock in determining the parent company' gain.

The operating losses of a subsidiary corporation do not stand in the same category as depreciation and depletion allowances on wasting assets, which, under the decision of the Supreme Court in *United States* v. *Ludey*, 274 U. S. 295, must be applied to reduce the base of such assets whether actually availed of to reduce taxable income or not. The basis in the hands of a parent corporation of the shares of a subsidiary is not affected by the operating losses of the subsidiary and must be determined as provided in the statute. Under section 113 of the Revenue Act of 1926 the basis in the hands of the petitioner of the Midwest Co. shares was their cost. Since this cost was greater than the selling price but the difference was less than the amount of the subsidiary's operating losses which were deducted in the consolidated returns for prior years, there was neither a gain nor a deductible loss on the sale of the shares by the petitioner in 1927.

*(b)—D. K. Co. (Deutsche Kahneisen Gesellschaft).*

In 1927 the petitioner sold 600 shares of D. K. Co. stock for $75,000. It acquired this stock on December 30, 1922, from the Midwest Co. at a cost of $100,000. The Midwest Co. in turn had acquired it from another of the Kreuger corporations, Aktiebolaget Kreuger & Toll, a Swedish corporation, in 1920 in exchange for

1,500 shares of its own capital stock. In its income tax return for 1927 the petitioner claimed a loss on the transaction in the amount of $75,000, which the respondent disallowed for the reason, as stated in his deficiency notice, that the 600 shares of the D. K. Co.'s stock were acquired by the petitioner from the Midwest Co. in exchange for its own capital stock in an intercompany transaction, the petitioner and Midwest Co. then being affiliated, and that the value of the shares as of that time, 1920, can not be shown.

The petitioner here contends that in any event it is entitled to the deduction of a loss on the sale of the stock in question of $25,000, the difference between its selling price and the amount which it paid for it in 1922; and that if it should be determined that it (the petitioner) and the Midwest Co. were affiliated in 1922 the amount of the deductible loss is $75,000, the difference between the selling price and the alleged cost of the shares to the Midwest Co. in 1920.

The respondent concedes that if the petitioner and Midwest Co. were affiliated in 1922, and he maintains that they were, the basis of the 600 shares of D. K. Co. stock in the hands of the petitioner is their cost to the Midwest Co. He contends, however, that this cost is not shown by the evidence and that therefore no loss deduction is allowable.

From a consideration of all of the evidence we are of the opinion that the petitioner is entitled to a loss deduction of only $25,000 from the sale of the D. K. Co. stock. The evidence does not show the value of the 600 shares of D. K. Co. stock at the time it was transferred to the Midwest Co. in exchange for 1,500 shares of its own capital stock. That value may not have been in excess of $100,000. We do know that the petitioner paid the Midwest Co. $100,000 for these shares. This is the correct basis for the computation of the loss.

### (c)—*Akatos, Inc., Stock.*

Prior to 1920 and after March 1, 1913, the petitioner acquired all of the capital stock, 100 shares, of Akatos, Inc., formerly C. P. Chemical & Drug Co., at a cost of $50,000. Thereafter, and during the period of their affiliation, petitioner advanced to Akatos, Inc., the aggregate amount of $76,555.12. During the years 1922 to 1927, inclusive, Akatos, Inc., had operating losses of $88,994.96 which were claimed and allowed as deductions from gross income in consolidated returns filed for those years by the petitioner, Akatos, Inc., and other affiliated corporations. In 1927 petitioner sold the 100 shares of Akatos, Inc., stock for $15,000 and claimed a loss thereon of $22,-560.16 in its income tax return for that year. The respondent determined in his deficiency notice that the petitioner sustained a de-

ductible loss of $111,555.12 on the transaction, being the difference between the cost to it of the Akatos, Inc., stock plus the amount of cash advanced to the company, and the selling price. The respondent now contends that the determination in his deficiency notice is in error and that the petitioner's income, as determined therein, should be increased by the amount of the net operating losses for Akatos, Inc., which were allowed as deductions in the consolidated returns filed for prior years. The amount of such losses is stated in the respondent's pleadings as $88,931.97 instead of $88,994.96.

The respondent's contention that the operating losses of Akatos, Inc., which were deducted in the consolidated returns for prior years to the extent of $88,931.97, should be applied to reduce the petitioner's loss on the sale of the shares in 1927 is sustained upon authority of *Ilfeld Co.* v. *Hernandez, supra*, and other cases cited in our discussion under issue 1 (a).

### Issue 2.—Loss on Match Transactions.

During 1927 and 1928 the petitioner sold matches in the United States which it had imported from Europe. The cost of the matches sold in 1927 and 1928 exceeded the selling price, as shown in petitioner's books, by the amounts of $68,134.33 in 1927 and $10,330.58 in 1928. By direction of Anders Jordahl, petitioner's president, these amounts were charged in the petitioner's books to the Swedish Match Co., another Kreuger controlled corporation, in Stockholm, Sweden, which was engaged in manufacturing matches and holding stocks of other companies. These charges against the Swedish Match Co., with minor adjustments on account of operations in subsequent years, were carried in petitioner's books as an open account until 1932 when, on Ivar Kreuger's instructions, they were transferred to his personal account with the petitioner. Kreuger's account at that time showed a credit balance of $278,903.96.

In its income tax return for 1927 the petitioner reported under gross income an item "Loss on Match Operations included in Cost and Expenses—charged to Swedish Match Co. 68,134.33." A similar item of $10,330.58 was reported in petitioner's return for 1928. The respondent's deficiency notice shows no adjustment respecting these items.

The petitioner kept its books and made its returns upon an accrual basis.

The petitioner alleges in its amended petition that the respondent erred in disallowing the stated amounts of $68,134.33 and $10,330.58 as losses of the respective years 1927 and 1928. It is now contended on behalf of the petitioner that the amounts in question constitute deductible operating losses of the respective years 1927 and 1928 and

that such amounts were erroneously entered in its books and reported in its returns as items of accrued income.

The evidence indicates that the petitioner at the request of Kreuger entered into these match transactions. So far as the record shows, Kreuger was aware that the petitioner had charged against the Swedish Match Co. the difference between the cost of the matches sold and the amount realized therefrom, and acquiesced therein. This charge was eventually liquidated out of a credit due to Kreuger. The petitioner sustained no loss in either of the years 1927 or 1928, or eventually, in respect of the match transactions. The claim of the petitioner that the net incomes for 1927 and 1928 should be reduced by $68,134.33 and $10,330.58, respectively, is not approved.

### Issue 3.—Amortization of Patents.

The Arenco Machine Co. in 1927 and 1928 was a wholly owned subsidiary of the petitioner, engaged in the business of importing cigarette packing machines for sale in the United States. These machines were manufactured in Sweden upon order from the petitioner and were covered by six United States patents owned by the Arenco Machine Co. The function of the machines was to count and pack cigarettes in convenient packages, usually twenty, for retail trade. The machines were sold principally to large cigarette manufacturers in this country. Their sale price was between $8,500 and $10,000 each. It was estimated by officers of the Arenco Machine Co. in 1926 that there would be a market in the United States for approximately 500 cigarette packing machines and it was believed that the petitioner would be able to supply the market to the extent of 400 machines. About 50 machines had been sold prior to 1927, of which 33 had been sold in 1926. There were 180 sold in 1927, 81 in 1928, 44 in 1929, none in 1930, 22 in 1931, none in 1932 or 1933, 8 in 1934, none in 1935, and 21 in 1936. The 21 machines sold in 1936 were sold at a large discount and were the last that the manufacturers had on hand. It was not expected at that time that any more machines of that type would be manufactured or sold. A superior machine had been developed and put on the market by an American company in 1930 and since that time about 200 American machines have been sold.

The first of the six United States patents under which the cigarette packing machines were manufactured was issued in May 1921 and the last in June 1924. These patents were acquired by the Arenco Machine Co. from a Swedish corporation in about 1925 or 1926 at a cost of $200,000 and were owned by the Arenco Machine Co. in 1927 and 1928.

Fritz Atterberg, the former president of the Arenco Machine Co., when asked if he knew whether any new machine for the packing of cigarettes had been invented, replied:

Yes, I know of my own knowledge that the same company in Sweden that has manufactured these machines is developing or has practically developed a new machine which is much superior in every respect to the machine we are discussing.

The Arenco Machine Co. went out of business in 1932 and a new corporation by the same name was organized in that year. The new company did not acquire the patents referred to above or any of the other assets of the old company. The witnesses did not know what had become of the old patents—whether they had been useful to the Swedish company in the development of a new machine.

In its consolidated return for 1927 the petitioner claimed an amortization deduction on the above described patents owned by the Arenco Machine Co. in the amount of $35,788.25, with the notation "Amortization has been calculated on a machine rate basis calculated to fully amortize these patents at the time when sales shall have reached a saturation point." The respondent in his deficiency notice reduced the amount claimed to $14,501.40, amortizing the cost basis of $200,000 used by the petitioner over the life of the patents. Likewise, in its 1928 consolidated return the petitioner claimed a deduction for amortization of the patents in the amount of $93,637.75, of which the respondent has allowed the deduction of $14,501.40, the same amount allowed in 1927, and has disallowed the balance claimed of $79,136.35.

The petitioner contends in this proceeding that amortization on the patents should be computed "on the, basis of the number of machines sold during each taxable year; that is, the value of $200,000 placed upon the patents should be amortized in each taxable year in the ratio which the number of machines sold in that year bears to 400." In the alternative, the petitioner contends that it is entitled to an allowance for depreciation of the patents on the basis of their having become worthless by the end of the year 1931, which result could be foreseen in 1927.

The statute provides for a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business, including a reasonable allowance for obsolescence. See sections 234 (a) (7) of the Revenue Act of 1926 and 23 (k) of the Revenue Act of 1928.

Ordinarily the depreciation allowance on patents is computed on the basis of the cost or March 1, 1913, value spread ratably over the remaining life of the patents. Under the Commissioner's regulations, however, an additional allowance for obsolescence may be taken when the patent becomes obsolete prior to its expiration "if

affirmative and satisfactory evidence that the patent became obsolete in the year for which the return is made is submitted to the Commissioner." See article 167 of Regulations 69 and article 207 of Regulations. 74, promulgated under the Revenue Acts of 1926 and 1928. See also *Hershey Manufacturing Co.*, 14 B. T. A. 867; affd., 43 Fed. (2d) 298; and *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513.

A United States patent has a life of 17 years. The question here is whether an allowance of one-seventeenth of the cost of each of the patents acquired by the Arenco Machine Co. constitutes a reasonable allowance for depreciation of the patents in each of the years 1927 and 1928. Petitioner contends that it does not; for in 1926 the officers of the Arenco Machine Co. estimated that the total number of machines which could be absorbed by the American market was only approximately 400 machines. The evidence, however, does not show the life of the machines or whether there would be a demand for the replacement of the machines. Neither does it show that the estimate was accurate as to the number of machines for which there was a demand. The evidence does show that a superior machine was developed in the United States in 1930 and also that the Swedish company which had manufactured the machines has practically perfected a new machine. Apparently it is contemplated that there will be a demand for the improved machine. The witnesses did not know what had become of the patents formerly owned by the Arenco Machine Co. They did not know whether they had been acquired by the Swedish manufacturers or whether the new Swedish machine is being developed upon the basis of those patents.

Even if the evidence might support a claim for obsolescence of the patents for later years, there is no evidence that any obsolescence occurred prior to 1930, when the American machine was put on the market. Upon the evidence of record the petitioner's claim for an obsolescence allowance in excess of the allowance made by the respondent in the determination of the deficiencies is disapproved.

*Issue 4.—Exchange of Assets for Petitioner's Own Capital Stock.*

In 1927 the petitioner transferred to Ivar Kreuger in exchange for 15,000 shares of its own capital stock of a par value of $1,500,000 the following assets:

| | |
|---|---|
| Account receivable against Swedish Match Co | $8,440.55 |
| Account receivable against Aktiebolaget Kreuger & Toll | 228,419.57 |
| Stock of Swedish Match Co. (book value) | 1,190,000.00 |
| Total | 1,426,860.12 |

In recording the transaction in its books petitioner credited Ivar Kreuger's account with $1,500,000 and debited it with $1,426,860.12. Later, adjusting entries were made as of the close of the year 1927 debiting Kreuger's account with $73,139.88 and crediting "capital surplus" account with the same amount. The amount of $73,139.88 appears in petitioner's income tax return for 1927 in "Schedule 'L'— RECONCILIATION OF NET INCOME AND ANALYSIS OF SURPLUS" under the entry "Capital Surplus Acquired by exchange of assets having a book value of $1,426,860.12 for 15,000 shares own capital stock." This item of $73,139.88, however, was not included in petitioner's gross income.

In his answer to the amended petition herein the respondent affirmatively alleges that the petitioner realized a taxable gain of $73,139.88 on the above described exchange of assets for its own capital stock and that the deficiency as determined in the deficiency notice, which failed to include the amount in gross income, should be increased accordingly.

The respondent has the burden of proving that the petitioner realized a taxable profit of $73,139.88 upon the redemption of 15,000 shares of its own capital stock. We are of the opinion that the respondent has not borne this burden. The bookkeeping records are not competent proof of the realization of this amount of income. We do not know what the petitioner received from the issuance of the 15,000 shares of stock in question nor do we know the value of the shares at the time they were redeemed by the petitioner. In the light of the evidence it must be held that the petitioner realized no taxable gain from the redemption of the shares in question.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*