The George M. Jones Company v. Commissioner.
George M. Jones Co. v. Commissioner
Docket No. 108218.
United States Tax Court
1944 Tax Ct. Memo LEXIS 118; 3 T.C.M. (CCH) 953; T.C.M. (RIA) 44297; September 15, 1944
*118 John J. Kendrick, Esq., for the petitioner. Thomas F. Callahan, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: The petitioner seeks a redetermination of tax deficiencies in the amount of $175,455.85 for the calendar year 1934 as follows: Income taxes
$147,000.96
Excess-profits taxes
28,454.89
The issues involved are: (1) The worthlessness in 1934 of the common stock of the following corporations: The Commodore Perry Company
$183,300.00
Hotel Lorraine Company
10,000.00
Morris Coal Company
5,012.50
(2) Bed debt deductions as follows: Balance due from The Commodore Perry Company
$626,319.67
Balance due from Hotel Lorraine Company
84,148.06
(3) Whether the petitioner realized taxable profit upon the redemption in 1934 of the preferred stock of the Ohio Collieries Company, a subsidiary. The case was submitted upon a stipulation of facts, oral testimony and exhibits. We find the facts set forth in the stipulation. Any additional facts are found from the evidence. Findings of Fact 1. The Commodore Perry Company The petitioner, The George M. Jones Company, is an Ohio corporation having its principal place *119 of business at Toledo, Ohio. Its federal income and excess-profits tax return for the year 1934 was filed with the collector of internal revenue for the tenth district of Ohio. During the year 1934 the petitioner was engaged in the business of marketing coal, most of which it acquired from subsidiary companies and related companies. It also engaged in the business of financing wholly owned subsidiaries and other corporations in which it had theretofore acquired substantial interests. Prior to and in 1934, the petitioner maintained its books and records on the accrual system of accounting. On January 1, 1934, and throughout that year, the petitioner owned 1,833 shares of the common stock of the Commodore Perry Company (hereinafter called "Perry"), acquired November 13, 1931 at a cost of $183,300. The total outstanding stock of that company consisted of 2,500 shares of common stock of the par value of $100 per share. The balance of 666 shares were held by residents of Toledo, Ohio, none of whom owned any shares of the petitioner except George M. Jones, Jr., who owned 50 shares of the stock of Perry and who at that time held a minor interest in the petitioner. Perry was an Ohio corporation *120 organized July 1, 1921, with an authorized capital of $50,000, divided into 500 common shares of the par value of $100 each. On May 31, 1922, it increased its capitalization to $250,000, consisting of 2,500 shares of the par value of $100 each. On April 10, 1922, Perry entered into a 99-year lease upon a parcel of property located at the corner of Jefferson Avenue and Superior Street, Toledo, Ohio. On May 3, 1922, it acquired by purchase three adjacent parcels at a cost of $244,000. In May 1924, the company determined to erect a hotel on these premises. In 1925 a contract was executed and construction was commenced. In the early part of 1927 the construction and equipping of the hotel was completed at a total cost of approximately $3,400,000. The financing of the construction and equipment of the hotel was accomplished by borrowing funds from the petitioner, The Ohio Collieries Company, a wholly owned subsidiary of the petitioner, and the Cambria Collieries Company, a company associated with the petitioner, upon the unsecured interest bearing notes of Perry. On December 31, 1927, Perry was indebted to these financing creditors in the following amounts, excluding accrued interest: *121 The petitioner
$1,375,000.00
The Ohio Collieries Company
1,545,000.00
The Cambria Collieries Company
665,000.00
Total
$3,585,000.00
The following is a statement of the balances due the petitioner from Perry from 1925 to 1934, inclusive; the advances made by the petitioner, the payments made to the petitioner and the application by the petitioner of the amounts to principal and interest: Applied to
Applied to
Year
Advance
Principal
Interest
Balance
1925
$ 257,000.00
$ 20,000.00
$ 237,000.00
1926
1,038,000.00
10,000.00
1,265,000.00
1927
140,000.00
30,000.00
1,375,000.00
1928 Accrued Int.
155,323.71
97,000.00
$ 13,494.89
1,419,828.82
1929 Accrued Int.
83,978.86
130,000.00
182,832.86
1,190,974.82
1930 Accrued Int.
71,288.94
85,179.42
1,177,084.34
1931
125,000.00
1931 Accrued Int.
71,913.74
40,167.15
1,333,830.93
1932 Accrued Int.
78,702.71
20,442.06
1,392,091.58
1933
34,050.00
1933 Accrued Int.
40,636.65
5,300.00
36,451.06
1,425,027.17
1934
12,000.00
1,437,027.17
The above indebtedness to petitioner was represented by five promissory notes as follows: Rate of
Date of Note
Interest
Face of Note
July 1, 1932
6%
$1,222,120.80
July 1, 1932
5%
130,055.77
January 31, 1933
6%
12,000.00
April 15, 1933
6%
16,750.00
March 20, 1934
6%
12,000.00
Total
$1,392,926.57
Accrued and unpaid interest not
included in face amount of
notes
44,100.60
Total indebtedness due June 30,
1934
$1,437,027.17
*122 The petitioner, during each of the years 1928 to 1933, inclusive, accrued interest on the obligations due it from Perry, reporting the same as income. The net losses for income tax purposes of Perry for the years 1927 to 1934, inclusive, were as follows: Year
Amount
1927
$397,252.95
1928
154,759.80
1929
72,960.64
1930
151,779.39
1931
238,581.65
1932
361,467.43
1933
413,585.03
1934
275,189.12
The deficit of Perry for the years 1930 to 1934 was as follows: Year
Amount
1930
$ 726,744.25
1931
965,325.90
1932
1,488,963.07
1933
1,900,594.78
1934
2,172,851.94
In June 1931, one of Toledo's largest banks closed its doors and three of Toledo's banks went into liquidation. Some of these banks were reorganized. In February 1933, receivers were appointed for the Willys-Overland Company, Toledo's largest industry. During the years 1933, 1934 and 1935, the receivers continued to operate the company but the operations were somewhat curtailed. In 1936 it was reorganized under section 77B of the Bankruptcy Act on a much smaller scale. On December 23, 1933, the Ohio Liquor Control Act was passed. In the Spring of 1934, the hotel commenced to sell alcoholic beverages *123 to its patrons. Prior to the opening in 1927 of this hotel, the best hotel in Toledo was the Secor Hotel which was located across the street. The Secor Hotel in 1932 became financially involved and was placed in receivership. Due to its bad physical condition, the Secor Hotel offered little competition. The bankers in control of the Secor Hotel declined to advance the necessary funds, estimated to be between $350,000 and $400,000, to renovate and rehabilitate it as a first-class hotel. In 1933 and early 1934, opinion was current that the Secor Hotel would be dismantled and razed. The owners of Perry thereupon reached the conclusion that under a more capable and experienced management its hotel might show more favorable results. To this end they conferred with Horwath & Horwath, hotel experts of New York City. As a result of several weeks' negotiation they induced Daniel J. O'Brien to take over the operation of the hotel. Mr. O'Brien had been in hotel operation practically all his life and had been connected with such hotels as the Belmont in New York, the Mayflower in Washington, and at that time was operating the Towers Hotel in Brooklyn. Mr. O'Brien, before consenting to become *124 associated with the hotel, went to Toledo to investigate the hotel situation in that city. He satisfied himself that the Secor Hotel would not be rehabilitated. He demanded a contract under which he would have an equity in the hotel property in the event his efforts proved successful. The owners of Perry acceded to his demand and a contract for O'Brien to manage the hotel was executed. Pursuant to the terms of the agreement between O'Brien and Perry, which followed the general pattern of the plan originally presented to O'Brien by Horwath & Horwath, the following transactions, all of which were duly authorized and approved by the respective boards of directors and stockholders of the companies involved, took place: A new corporation, The Commodore Perry Hotel Company (hereinafter called "Commodore") was organized, with an authorized capital stock of 1,000 shares of no par value, but with a declared value of $1 per share; The value of the net operating assets of this hotel, after deducting the current liabilities (but excluding from the liabilities the indebtedness of Perry to the petitioner, to The Ohio Collieries Company and to The Cambria Collieries Company) amounted to $50,000; *125 Perry transferred to Commodore the title to its hotel properties, including the land owned by the corporation, the leaseholds, the building, the furnishings, equipment and the other assets. In consideration therefor Commodore gave a mortgage of $2,500,000 to Perry. The mortgage note was dated July 1, 1934, was non-interest bearing until January 1, 1935, and the rates of interest, the sinking fund requirements after January 1, 1935, as well as the schedule of defaults, were most favorable to Commodore. Commodore also issued to Perry its promissory non-interest bearing note in the amount of $40,472.78, which was to remain unpaid for 17 years, being the term of the contract entered into between O'Brien and Perry; and issued to Perry its authorized capital stock; Perry placed in escrow 45 per cent of the shares of common stock of Commodore thus received by it (450 shares), which were to be held in escrow until under certain contingencies provided in the contract between O'Brien and Perry (principally the reduction of the $2,500.000 mortgage note) these 450 shares were to be delivered absolutely to O'Brien; Perry delivered the mortgage note of $2,500,000 to petitioner, The Ohio Collieries *126 Company and The Cambria Collieries Company, to be applied on the indebtedness of Perry to them in proportion to the amount of their claims; Perry reduced the par value of its outstanding shares from $100 per share to $1 per share, transferring the amount by which the capital was so reduced to its surplus and deficit account. Upon receipt from Perry of its $2,500,000 first mortgage note, petitioner, The Ohio Collieries Company and The Cambria Collieries Company caused the organization of Perry Corporation, with an authorized capital stock of 10,000 shares of no par value, and to that corporation the $2,500,000 mortgage was assigned and transferred, in consideration for which those corporations received the number of shares of Perry Corporation common stock hereinafter set forth: Number of Shares
Petitioner
3,242.83
The Cambria Collieries Company
2,201.56
The Ohio Collieries Company
4,555.61
Total
10,000.00
Perry, upon delivery of its first mortgage note in the amount of $2,500,000, as aforesaid, debited upon its books the note accounts of petitioner, of The Cambria Collieries Company and of The Ohio Collieries Company, as follows: Petitioner
$ 810,707.50
The Cambria Collieries Company
550,390.00
The Ohio Collieries Company
1,138,902.50
*127 On August 18, 1934, petitioner endorsed upon the note of Perry, dated July 1, 1932, in the face amount of $1,222,120.80 held by it, the sum of $810,707.50. Thereafter petitioner held the following notes of Perry: Interest
Principal
Date of Note
Rate
Balance Due
July 1, 1932
6%
$411,413.30
($1,222,120.80 less
$810,707.50 payment)
July 1, 1932
5%
130,055.77
July 31, 1933
6%
12,000.00
April 15, 1933
6%
16,750.00
March 20, 1934
6%
12,000.00
Total
$582,219.07
At that time, August 18, 1934, accrued interest upon these notes, as reflected by petitioner's books, totaled $44,100.60, which had been accrued and reported for income tax purposes. The total amount of the indebtedness of Perry to petitioner, including this interest, was $626,319.67. On or about June 20, 1934, those interested in the future of the Secor Hotel negotiated with Theodore DeWitt, president of the DeWitt Hotels, Inc., to take over the operation of that hotel. It was determined to issue bonds in the amount of $450,000 to modernize and rehabilitate the hotel as a first-class hotel. DeWitt purchased $50,000 of these bonds. The Secor Hotel was then closed for the months of July, August *128 and September 1934, during which time it installed a ballroom, a cocktail lounge and a new coffee shop. The rooms were renovated, and new and refinished furniture installed. On October 6, 1934, the Secor Hotel reopened under the name of the New Secor Hotel as a first-class hotel in active competition with the Commodore. During the months of July. August and September 1934, when the Secor Hotel was closed, the operating profit of Commodore, before taxes, insurance, depreciation and ground rent, and the percentage of room occupancy, compared with the same months in 1933, was as follows: Month
Operating Profit
Percentage of Occupancy
1934
1933
1934
1933
July
$ 6,941.60
$3,856.89
40.01
22.56
August
9,612.49
5,714.88
45.98
32.47
September
10,748.27
7,199.16
50.41
35.85
In the month of October 1934, after the New Secor Hotel reopened, Commodore earned an operating profit, before taxes, insurance, depreciation, interest and ground rent, of $2,681.11, as compared with $10,600.95 for the month of October 1933; the operating profit for the month of November 1934 was less than 50 per cent of the November 1933 profit; and the operating loss for December 1934 *129 was three times the loss for the month of December 1933. The percentage of room occupancy of the Commodore Hotel went from a 50.42 per cent high in 1933 to a low of 29.41 per cent in 1934. The average rate per occupied room decreased to $3.04 in December 1934, the lowest for any month in the years 1933 and 1934. During the last quarter of 1934 the average room rentals of the New Secor Hotel were approximately $11,000 per month. The larger part of this business was taken from Commodore. The repeal of the Eighteenth Amendment to the Federal Constitution caused hotel operators to become generally optimistic of large anticipated profits from the sale of alcoholic beverages. This optimism was based on experiences of the pre-prohibition era. However, by December 1934 it was apparent to those interested in Commodore that the large anticipated profits would not be forthcoming. Not only the new regulations under which alcoholic beverages could be purchased and sold, but the habits and customs of the patrons had materially changed. In Ohio, hotels were required to purchase liquor by the bottle at an increase in price, whereas they had previously purchased in bulk and blended their own whiskies *130 and sold them under their own name. Formerly drinks were mostly served at bars but the new regulations required service at tables necessitating waiters and other service expenses. Night clubs and restaurants, furnishing entertainment and music, had come into competition. To meet this new competition hotels, likewise, were required to equip cocktail lounges and furnish entertainment. This added expense greatly reduced the profits expected to result from repeal. Commodore realized a profit of $6,426.28 from the sale of alcoholic beverages for the period July 1, 1934 to December 31, 1934, as against an estimated annual profit from this source of $75,000. Despite the new and able management, Commodore operated at a net loss of $46,441.13 for the last six months of 1934. On December 31, 1934, the assets of Perry consisted of a cash balance of $276.89; claims of the market value of $398.73 against closed banks; a note receivable of Commodore, non-interest bearing and not payable until the termination of the O'Brien contract, with a balance due thereon of $40,472.78; and all the outstanding capital stock of Commodore consisting of 1,000 shares, 45 per cent or 450 shares of which were escrowed *131 under the O'Brien contract. Its liabilities, as of December 1934, aggregated $2,212,500.34, which amount included the petitioner's claim of $626,319.67. In December 1934, the petitioner charged off this amount of $626,319.67 as uncollectible and in its federal income tax return for the year 1934 claimed the amount as a bad debt. The respondent disallowed this deduction in its entirety. The claim of the petitioner, in the amount of $626,319.67, against Perry became uncollectible and worthless in 1934. The petitioner in its 1934 income tax return claimed a loss in the amount of $183,300, representing its investment in the shares of the capital stock of Perry. The respondent disallowed the deduction. The common stock of Perry became worthless in the year 1934. 2. Hotel Lorraine Company The Hotel Lorraine Company (hereinafter referred to as "Lorraine") was incorporated under the laws of Ohio on November 5, 1924. Its authorized capital stock was $100,000. consisting of 1,000 shares of common stock of the par value of $100 each. The petitioner subscribed for and received 100 shares, for which it paid Lorraine $10,000. From its incorporation until its liquidation in 1936, the only *132 stock of Lorraine outstanding was the 100 shares held by the petitioner. At the time of the incorporation of Lorraine, Mrs. Maurice Moyer owned an unimproved parcel of real estate in the City of Toledo, Ohio. Upon this property she erected as second-class hotel having 105 rooms. On Paril 14, 1925, the entire hotel property (excepting five store rooms) was leased to Lorraine for a term of 25 years. The rental was $36,580 annually, payable monthly at the rate of $3,048.33, and in addition Lorraine obligated itself to pay the taxes in excess of $6,300 per year. At the first meeting of the board of directors, it was reported that the cost of the equipment, furniture, etc., would amount to $65,948. On April 23, 1925, the petitioner advanced to Lorraine, upon its unsecured promissory notes, the sum of $80,000 to enable Lorraine to equip the hotel and to provide working capital. Later Lorraine leased two of the five store rooms reserved by the lessor and the monthly rental was increased to $3,165. During the period 1925 to 1935, inclusive, Lorraine had a net operating profit in only two years, i.e., 1926 and 1929. Its balance sheets for the years ending December 31, 1930 to 1935, inclusive, *133 show the following deficits: 1930
$ 41,090.30
1931
68,388.24
1932
121,273.14
1933
138,013.13
1934
145,655.92
1935
136,991.41
In February 1932, the lessor reduced Lorraine's monthly rental to $1,750 and released its obligation to pay the taxes in excess of $6,300 per year for the period January 1, 1932 to January 31, 1933. On October 9, 1932, the monthly rental was reduced to $1,000 for the period July 1, 1932 to December 31, 1933. On July 18, 1933, it was agreed that the $1,000 monthly rental was to be effective until December 31, 1935. During the year 1934 the lessor informed Lorraine that after December 31, 1935 the monthly rental payments would revert to the $3,165 per month rate. On December 31, 1933, Lorraine's indebtedness to the petitioner, exclusive of accrued interest, amounted to $128,448.06. On July 11, 1934, the petitioner loaned Lorraine $4,000 and on October 25, 1934 it made a further loan of $1,892.76. On November 1, 1934, Lorraine paid to petitioner on account $92.76 and on November 25, 1934, $100. As of December 7, 1934, the total indebtedness of Lorraine to the petitioner was $134,148.06. No interest was received by the petitioner from Lorraine during *134 the years 1931, 1932 and 1933. The petitioner did not accrue on its books or report for income tax purposes any interest upon the unpaid balances of this indebtedness for those years. In 1934 the petitioner made a survey of the operations of Lorraine and, as a result, determined that the hotel could not be operated at a profit if no rental concessions were made by the lessor. The petitioner thereupon caused the hotel equipment, furniture, and furnishings to be appraised. It was determined that $50,000 was the largest amount that could be realized out of the sale of its personal property. The petitioner demanded and secured from Lorraine a promissory note for $50,000, secured by a chattel mortgage on the equipment, furniture, fixtures and furnishings. The $50,000 was credited against the irdebtedness, leaving a balance of $84,148.06 due on the unsecured indebtedness. During the year 1935, the petitioner received $4,500 and in 1936, the sum of $12,536.86, which was credited upon the principal of the secured indebtedness. During 1935 the petitioner also received the sum of $3,180.39, and in 1936, the sum of $856.75, and credited both of these amounts to interest due upon the secured *135 note. During the years 1935 and 1936 the petitioner received nothing upon either principal or interest on account of the claim of $84,148.06 which it had charged off in December 1934. In the year 1936 Lorraine surrendered possession of the leased premises and upon the payment of $2,000 was released from all demands and obligations to the lessor. The petitioner, in 1936, removed the personal property covered by the chattel mortgage and endeavored to sell the same. The highest bid was $5,000 and it refused to sell. The petitioner took over the personal property at a value of $7,500, which was credited upon the mortgage note. The petitioner expended $3,800.82 rehabilitating the property and in July sold it to the Willard Hotel Company, its wholly owned subsidiary, for $11,300.82. On its 1934 federal income tax return the petitioner claimed as a bad debt deduction the sum of $84,148.06, being the balance of the unsecured indebtedness to it of Lorraine. The petitioner also claimed a loss of its investment in the capital stock of Lorraine in the amount of $10,000 as having become worthless in that year. The respondent disallowed both of these deductions. The unsecured claim of the petitioner *136 against Lorraine became worthless in the year 1934 to the extent of $84,148.06. The shares of the capital stock of Lorraine became worthless in the taxable year 1934. 3. The Morris Coal Company On January 1, 1934, the petitioner owned 250 shares of the common stock of the Morris Coal Company (hereinafter called "Morris"), which it previously acquired at a cost of $5,012.50. The petitioner also owned 114 shares of preferred stock of that corporation. The capital stock of Morris consisted of 1,764 preferred and 1,900 shares of common. Both classes of stock had a par value of $1 per share. The preferred shares carried a cumulative dividend of $1.50 per share payable April 1 and October 1 of each year. In the event of liquidation the preferred shares were entitled to receive $82 per share in addition to the accumulated and unpaid dividends. As of December 31, 1933, the accumulated and unpaid dividends amounted to $1,875 per share. The total amount due the preferred shareholders on December 31, 1933 was $147,955.50. On June 30, 1934, the assets of the company consisted of cash in the amount of $5,964.21, accounts receivable in the amount of $5,650.59, bills receivable in the amount *137 of $2,673.55, and certain coal properties, the liquidating value of all of which was in an amount insufficient to pay its obligations and the preferred stockholders in full. The petitioner was advised by letter, dated February 15, 1934, from Morris that owing to large operating losses serious consideration was being given to the problem of liquidation. Enclosed was a resolution which had been adopted declaring a liquidating dividend of $17 per share upon the preferred stock. The petitioner, on June 30, 1934, wrote Morris requesting a balance sheet. Additional correspondence passed between the petitioner and the officers of Morris. On July 16, 1934, the petitioner was advised that Morris had discontinued doing business. On July 23, 1934, the president of Morris advised the petitioner that there would be nothing left for common stockholders. Thereupon, the petitioner charged off the loss of $5,012.50 as its investment in Morris, as having become worthless in that year. On its federal income tax return for 1934, the petitioner deducted the sum of $5,012.50 as a total loss of its cost of the common stock in Morris. The respondent disallowed the deduction. The shares of the common stock *138 of Morris became worthless in the year 1934. 4. The Ohio Collieries Company On January 1, 1934, the petitioner owned 10,000 shares of the preferred stock of The Ohio Collieries Company (hereinafter called "Ohio"), being all of the outstanding preferred shares having a par value of $100 per share. These preferred shares were acquired by the petitioner on March 8, 1917 at a cost of $500,000. This stock was callable at $110 a share and bore cumulative dividends at the rate of $7 per annum. On the same date the petitioner also owned all the common shares of Ohio, consisting of 10,000 shares of the par value of $100 per share. The common shares had been acquired on February 16, 1917 at a cost of $10,449. On January 1, 1934, the petitioner was indebted to Ohio on open account in the amount of $2,911.905.33. On October 1, 1934, Ohio called its outstanding seven per cent preferred shares for redemption. The petitioner surrendered its shares and was credited upon its open account in the amount of $1,100,000. On its federal income tax return for the year 1934, the petitioner returned as income the sum of $600,000, being the difference between the petitioner's stated cost of these preferred *139 shares in the amount of $500,000 and the $1,100.000 credit upon Ohio's books, as the redemption value of the preferred shares. The respondent increased the amount of profit returned by the petitioner by $500,000 to $1,100,000. The petitioner, as parent corporation, filed consolidated income tax returns for the years 1924, 1925, and 1927 to 1933, inclusive, reporting in each of those returns consolidated losses with the result that it paid no tax for any of such years. The losses of Ohio availed of by the petitioner in reduction of its income, as determined by the respondent, totaled $985,877.14. This amount was applied by the respondent, first, in reduction of the basis to the petitioner of the common stock and the balance against the preferred stock of Ohio as follows: Common stock cost
$ 10,449.00
Losses of Ohio Collieries Co.
985,877.14
Balance
$975,428.14
Preferred stock cost
$500,000.00
Balance of losses
975,428.14
Balance unapplied
$475,428.14
The petitioner still held and owned all of the outstanding common stock of Ohio at the close of the taxable year 1934. The basis to the petitioner in 1934 of the 10,000 shares preferred stock of Ohio was $500,000. Opinion
*140 The first three issues involve losses claimed as debts ascertained and charged off as having become worthless in 1934 and certain losses claimed by reason of shares of stock becoming worthless in the same year. The amounts are not in dispute. In our findings of fact we have set out in detail the evidentiary facts. We will refer again only to those deemed essential to a clear understanding of our ultimate conclusions. The Commodore Perry Company The petitioner owned approximately 70 per cent of the common stock of Perry, which company owned and operated a first-class hotel. Over the years the petitioner advanced to Perry various sums of moneys so that on June 30, 1934 the latter was indebted to it in the amount of $1,437,027.17. For a number of years prior to the taxable year involved the hotel had shown a loss in its operations. The then manager being somewhat inexperienced in hotel operations, the owners of Perry felt that improvement might result if a thoroughly experienced hotel man was placed in charge. Through brokers they secured the services of one O'Brien, who had an established reputation as a manager of large hotels in metropolitan areas. O'Brien demanded a contract *141 that would give him an equity in the event his management proved successful. Pursuant to the provisions of that agreement a new corporation, known as Commodore, was organized with an authorized capital stock of 1,000 shares. Perry received all the stock, but 45 per cent thereof was escrowed for O'Brien's benefit. Title to the properties was transferred to Commodore which gave its promissory note for $2,500,000 and assumed the mortgage. The petitioner received the mortgage note from Perry. Thereupon the petitioner, its subsidiary, Ohio, and The Cambria Collieries Company, an associated company, all creditors of Perry, organized a new corporation under the name of the Perry Corporation. The authorized capital stock of this new corporation was 10,000 shares. The mortgage note and the stock of the Perry Corporation were allocated to these creditor companies of Perry in proportion to their respective claims against the latter. The petitioner's portion of the mortgage note was $810,707.50, which amount it credited against Perry's then indebtedness to it of $1,437,027.17. The balance of $626,319.67 was charged off on its books. On its income tax return for 1934, the petitioner claimed a *142 loss in the sum of $626,319.67 as a bad debt deduction. The respondent disallowed the deduction in its entirety. As of December 31, 1934, the assets of Perry consisted of cash amounting to $276.89; claims against closed banks of $398.73; a non-interest bearing note of $40,472.78, not payable until the termination of the O'Brien contract 17 years later; and the 1,000 shares of the capital stock of Commodore, 45 per cent of which it held in escrow. The total liabilities were $2,212,500.34. The petitioner's contention is that it then ascertained and charged off the balance of its claim against Perry, since various events had taken place in 1934 which reasonably convinced it that the indebtedness was uncollectible and worthless. Such events, briefly summarized, are: (1) The reopening of the modernized Secor Hotel which drew from Commodore a large part of its business; (2) the repeal of the Eighteenth Amendment, it was then learned, had not produced and would not produce the large revenue which it was confidently expected would flow therefrom; and (3) the operations of the Willy's-Overland Company, Toledo's largest industry, had been so curtailed that the business expected to come from *143 that source was very considerably diminished. The detailed evidence concerning these events convinces us that the petitioner's determination was justified. Under the Revenue Act of 1934, a bad debt loss could only be taken upon a showing that it had been ascertained to be worthless and charged off in the taxable year. [1] Both of these pre-requisites have been met. A certain amount of latitude must be given to the taxpayer's attitude. We are to be governed by practical considerations. Lucas v. American Code Co., 280 U.S. 445, 449. The petitioner is sustained on this issue. The petitioner also claims a loss of $183,300 on account of its total investment in the stock of Perry *144 becoming worthless in 1934. Since Perry was unable to meet its obligations to its creditors in that year, it logically follows that there was no equity remaining in the common shares. The only question then is whether the petitioner has established the stock had value at the end of the prior year. In 1934 Perry was a going concern. In the Spring of that year the petitioner was continuing to advance its funds in the reasonable hope of the possibility of success. Under such circumstances the petitioner could not have successfully claimed the loss in a prior year. Cf. Smith v. Helvering, 141 Fed. (2d) 529; Rassieur v. Commissioner, 129 Fed. (2d) 820; Miami Beach Bay Shore Co. v. Commissioner, 136 Fed. (2d) 408. We conclude that the stock of Perry became worthless in the taxable year 1934. On this issue the petitioner is sustained. The Hotel Lorraine Company The petitioner subscribed for and received 100 shares of the common stock of the par value of $100 per share of Lorraine. Later Lorraine commenced the operation of a small hotel under a lease. Between April 1925 and October 1934, *145 the petitioner advanced to Lorraine upon the latter's unsecured notes various sums of money. Certain payments were made and credited upon the loans. As of December 7, 1934, Lorraine was indebted to the petitioner in the amount of $134,148.06. Under a 25-year lease Lorraine had obligated itself to pay an annual rental of $36,580 and, in addition, to pay the taxes assessed thereon in excess of $6,300. Later, Lorraine leased two of the five stores originally reserved by the lessor, and its monthly rental was increased to $3,165. Except in the years 1926 and 1929 the hotel operated at a loss. In February 1932, the lessor reduced the monthly rental to $1,750 and released Lorraine from the obligation to pay taxes. In October of the same year the monthly rental was reduced to $1,000, effective to December 1935. During the year 1934 the lessor served notice upon Lorraine that after December 1935 the rent concession would cease and the rental would revert to $3,165 per month. Thereupon, the petitioner caused a survey and an appraisal of the equipment, furniture and furnishings of Lorraine to be made. It was determined that the most that could be realized upon a sale of the personal property *146 was $50,000. Lorraine executed and delivered to the petitioner a chattel mortgage covering its personal property to secure its promissory note for $50,000. That amount was credited by the petitioner against Lorraine's indebtedness, leaving a balance due of $84,148.06, which sum petitioner charged off in December 1934 as uncollectible. Lorraine continued to operate but surrendered its lease in 1936, whereupon the petitioner removed from the premises the personal property covered by its chattel mortgage. On its income tax return for 1934 the petitioner claimed the sum of $84,148.06 as a bad debt loss. The respondent disallowed the deduction. We think that the events taking place in 1934 were ample justification for the petitioner's ascertainment and charge off of the balance due it from Lorraine as uncollectible. It appears that the stock of Lorraine had no liquidating value for some years prior to 1934. However, the petitioner was willing to protect its investment by advancing funds. It was making advances as late as October 1934. The respondent concedes that under such circumstances the loss could not have been successfully claimed prior to 1934. Smith v. Helvering, supra; *147 Miami Beach Bay Shore Co. v. Commissioner, supra.The company continued to operate in 1935 and early 1936. Does that fact prevent us holding that the stock did not become worthless in 1934? We think not. It is clearly evident from all the circumstances that the operation was not continued in the hope that value would be restored to the stock. Rather the continuation was permitted only because the favorable reduction of the rent under the modification of the lease was effective until December 31, 1935 and thus might enable the petitioner to recoup something upon its secured indebtedness. Such hope was realized. During 1935 and 1936 the petitioner received a total of $17,036.86 on the principal and $4,037.14 which it credited upon interest of the secured indebtedness. In 1934 the petitioner, the sole stockholder, upon reasonable grounds abandoned hope of recovering anything on the stock. During that year it stopped giving financial assistance. It charged off the unsecured indebtedness of Lorraine to it. It charged off on its books the stock as worthless. In the light of these and other circumstances outlined with respect to the bad debt charge off heretofore *148 reviewed, we are convinced that the petitioner has sustained its burden of showing that the stock of Lorraine became worthless in 1934. The Morris Coal Company On January 1, 1934, the petitioner owned 250 shares of the common stock of Morris acquired at a cost of $5,012.50. In addition to the common shares, Morris had outstanding 1,764 shares of seven per cent cumulative preferred stock. In the event of liquidation of the company the preferred shares were entitled to receive $82 a share in addition to the accumulated and unpaid dividends before any distribution could be made to the common stockholders. As of December 31, 1933, the accumulated and unpaid dividends amounted to $1,875 per share. In February 1934 the petitioner was notified by the officials of Morris that owing to large operating losses a liquidation of the company was under consideration. The petitioner requested further information and was advised, on July 16, 1934, that Morris had ceased doing business. Later in that month the president of Morris informed the petitioner that upon the liquidation there would be nothing for distribution to the common shareholders. Upon receipt of that information the petitioner *149 charged off its total investment in the common stock of Morris as worthless. On its 1934 income tax return the petitioner claimed a loss of $5,012.50 on account of the worthlessness of these shares, but the deduction was disallowed. The respondent now contends that the common shares of Morris had neither actual nor potential value as of December 31, 1933 and that petitioner has not sustained its burden of showing the shares became worthless in 1934. We do not agree. It appears from the evidence that on December 31, 1933, Morris had liquid assets of $49,627.02. The current liabilities, exclusive of the capital stock, were $283.01. With 1,764 shares of preferred of the par value of $1 outstanding, on which the accumulated and unpaid dividends amounted to $1,875 per share, the total liability on the preferred stock as of December 31, 1933 was $5,182.50. On the basis of the December 31, 1933 statement, there was still an equity existing in the common stock. The parties stipulated that in addition to the liquid assets Morris had certain coal property, "the liquidating value of which was an amount insufficient to pay off the preferred creditors in full". The apparent basis for this statement *150 is that upon liquidation the preferred shares were entitled to receive $82 per share before any distribution was made to the common shareholders. On liquidation, the total liability on the preferred shares would be $147,955.50. Obviously, when the added liability attaching to the preferred came into existence the common stock was without value, actual or potential. This added liability, however, became fixed only when liquidation was determined upon in 1934. Morris was a going concern until March 1934, and on the bases of its assets and liabilities as of December 31, 1933, its common shares had potential value. Smith v. Helvering, supra;Miami Beach Bay Shore Co. v. Commissioner, supra.The determination to liquidate Morris in 1934 was the "event" fixing the added liability on the preferred shares and depriving the common shares of either actual or potention value. American Utilization Co., 38 B.T.A. 322. The common stock of Morris became worthless in 1934, and the petitioner is sustained as to that issue. The Ohio Collieries Company This issue involves the basis for gain or loss to the *151 petitioner on the 10,000 shares of the preferred stock of Ohio, a wholly owned subsidiary, redeemed in 1934 at the call price of $110 per share. Of these shares, 5,000 were acquired in March 1917, at a cash cost of $500,000. The other 5,000 shares were received as a stock dividend in 1922. As of January 1, 1934, the petitioner was indebted to Ohio on open account in the total sum of $2,911,905.33. On the redemption of the preferred shares, the petitioner received $1,100,000 which sum was credited against the indebtedness. On its 1934 tax return the petitioner reported a taxable gain on the transaction of $600,000, being the difference between the cash cost and the redemption value. The respondent "adjusted" the base to the extent of $985,877.14, since the petitioner had availed itself of losses of Ohio in that amount on consolidated returns filed in prior years. By reason of the adjusted basis, the respondent determined the profit to be the full redemption value of $1,100,000. At the trial the petitioner endeavored to establish a total base of $4,290,660.67. It argues that its cash cost of $500,000 should be increased by the following: $739,322.15, an allocation of the alleged value *152 of assets of the Continental Mining Company asserted to have been transferred to Ohio in 1917 and credited on the latter's books as "Paid In Surplus"; the sum of $2,551,338.52, an allocation of the alleged value of assets transferred to Ohio in 1917 by the petitioner; and the 5,000 preferred shares of the par value of $100 each received as a stock dividend in 1922. The petitioner's proof as to the value of the assets transferred to Ohio consisted of the testimony of a witness having no personal knowledge of the actual facts or the properties transferred. This witness was only 15 years old at the time of the transactions in question and the testimony which he gave was based merely upon the book entries made long prior to his connection with the petitioner. He attempts to testify to certain conclusions drawn by him from such records. This testimony lacks probative value. The book entries appear to have been made on the basis of some appraisal, but the petitioner was unable to offer testimony of those making the appraisal and we are left without evidence upon which its correctness may be tested. The existence of a certain value in an asset is a question of fact which can not be established *153 merely by evidence of a book entry. Where a valuation is of the essence the best evidence rule must be followed and the opinion of a witness, whatever his standing and credibility, as to the values of assets as to which he has no personal knowledge will not justify a departure. One of the items included in the asset total is referred to as an "account receivable" of the George M. Jones Company, in the amount of $689,116.16, which petitioner attempts to establish as having a value in that amount when transferred. It is insisted that this value is shown by proof that this account was paid by the debtor within the year following the transfer. However, the facts testified to as establishing payment fall far short, in our opinion, of proof that such was the fact. The witness merely identified book entries by the George M. Jones Co. showing payments wholly unidentified in character and in a total amount exceeding the face value of the account receivable. As it appears that transactions in large amounts were customarily taking place between the Jones Company and Ohio it is impossible for us to conclude, upon this testimony, that the payments recorded were in satisfaction of this particular *154 account receivable. The relation of the companies is close and the record which petitioner is able to present covering financial transactions appears to be insufficient in detail. For all we know, the indebtedness may have been charged off and that intention have existed at the time of its book transfer to Ohio. We do not agree with petitioner's contention that the stock dividend of $500,000 in preferred stock paid in 1922, although not treated then as income, was in fact taxable as such and increased in that amount petitioner's cost. Petitioner relies upon Koshland v. Helvering, 298 U.S. 441, as supporting its contention that the dividend in question was taxable in character. It has overlooked that the cited case only holds that a dividend of that character is constitutionally taxable if Congress sees fit to impose a tax, but that such a dividend was specifically exempted from tax by the statute, [2] as was pointed out in Helvering v. Gowran, 302 U.S. 238. The crucial question, then, is whether respondent properly "adjusted" the cash cost *155 of $500,000 of the 10,000 preferred shares by an application of losses of Ohio availed of by the petitioner on consolidated returns filed in prior years. The respondent contends that his action is supported by Article 113 (b)-1 of Treasury Regulations 86. This article provides, in substance, that in determining the basis for the gain or loss on disposition of stock "Adjustments must always be made to eliminate double deductions or their equivalent". The petitioner answers that Article 113 (b)-1 only applies where a taxpayer is claiming a loss and has had the benefit of deductions relative to its affiliate during the consolidated period. The petitioner says it is not claiming a loss and the double deduction rule is not involved. The case of Jordahl & Co., 35 B.T.A. 1136, is relied upon by the petitioner as decisive. One of the issues presented in the Jordahl case appears to be identical with that of the instant case. In connection with this issue we there said: In his amended pleadings the respondent contends affirmatively that the petitioner realized a taxable gain on the sale of the Midwest Co. stock measured by the difference between the original *156 cost thereof, reduced by the amount of the operating losses deducted in the consolidated returns, and the selling price. This contention is likewise without merit. Ilfeld Co. v. Hernandez, supra, and the other cases cited above deal only with loss deductions. There is no implication that the rule therein stated is to govern in the computation of a taxable gain to rule restricting the loss deductions, as the court pointed out, is to prevent a parent corporation from twice deducting the losses of a subsidiary corporation. * * * * *
In Remington Rand, Inc. v. Commissioner (C.C.A., 2d Cir.), 33 Fed. (2d) 77, cited in Ilfeld Co. v. Hernandez, supra, the court held that a subsidiary company's accumulated earnings could not be added to the cost of the stock in determining the parent company's taxable gain on its sale to outside interests. As a corollary the subsidiary's losses should not be subtracted from the cost of the stock in determining the parent company's gain. * * * The basis in the hands of a parent corporation of the shares of a subsidiary is not affected by the operating losses of the subsidiary and must be determined as provided *157 in the statute. * * * The Jordahl case was reviewed by the Board and acquiesced in by the respondent.[3] The respondent, seeking to overcome the effect of that decision, points out that the year involved was 1927, and that the principle did not apply with respect to the sale of stock of a subsidiary which was included in a consolidated return for any of the years 1929 to 1933, inclusive. The respondent relies mainly on Manchester Savings Bank & Trust Co., 34 B.T.A. 1008. In that case we held that in computing the amount of gain from the liquidation of a subsidiary company in the taxable year 1932, the cost basis of the stock should be reduced by the losses of the subsidiary company for all prior years in which such losses had been availed of by the parent company in consolidated returns. Our decision was predicated on Article 34 (c), Regulations 78. The Manchester Savings Bank & Trust Co. case, supra, also differs in that there the liquidation was complete and the affiliation destroyed. Here we have a redemption of the preferred stock of a subsidiary held by the parent company, which *158 redemption did not terminate the affiliation, and made subsequent to 1933 the last year in which consolidated returns were permitted to be filed. The stock had been held by the parent during the period 1929 to 1933, inclusive, and consolidated returns had been filed for those years subject to sections 141 of the 1928 and 1932 Acts authorizing the Commissioner to make regulations for the filing of such returns and for the determining of the adjusted cost basis for property acquired during affiliation, and making such regulations binding on affiliated companies taking advantage of the privilege of filing consolidated returns. In accordance with the authorization of the Statute, the Commissioner issued in the 1928 Act and the 1932 Act his Regulations 75 and 78, and in Article 34 provided for the adjustment of the cost basis for gain or loss with respect to stock of a subsidiary held by the parent and redeemed in whole or in part as is here the case. In Art. 34 (b) it is provided that in such case if the redemption or sale of the stock does not break the affiliation (as is true here) the basis shall be adjusted "in the same manner as if the selling corporation and the issuing corporation *159 had never been members of an affiliated group". This of course means that any losses deducted shall be disregarded in the adjustment. From the above it is thought clear that if the transaction here in question had occurred in any of the years from 1928 to 1933, there could be no doubt that the regulations would have precluded any such adjustment as is here made in determining the deficiency. We so held in the Jordahl case. However the transaction occurred in 1934 after the privilege of filing consolidated returns was withdrawn by the limitation of section 141 (d) (3) of the Revenue Act of 1934. Under the latter Act, the Commissioner issued his Regulations 86, providing in Art. 113 (a) (11)-1: * * * The basis in the case of property held by a corporation during any period, in the taxable year 1929 or any subsequent taxable year, in respect of which a consolidated return is made or is required under Regulations 75, Regulations 78, or Regulations 89, shall be adjusted in respect of any items relating to such period in accordance with such regulations. The basis of property after a consolidated return period shall be the same as immediately prior to the close of such period. This *160 rule is applicable, for instance, to the making of separate returns by the members of an affiliated group of corporations for taxable years begining after December 31, 1933, due to the withdrawal under the law of the privilege of making consolidated returns. * * * In the next succeeding section of Art. 113 of the Regulation, being Art. 113 (b)-1 headed "Adjusted Basis: General Rule", the Commissioner uses this language: "Adjustments must always be made to eliminate double deductions or their equivalent". He now argues that the word "equivalent" should be construed as a direction that in computing a gain the original cost of property should be adjusted by deduction of losses of an affiliate taken advantage of in prior years under a consolidated return. A careful reading of the Regulation leaves us convinced that such construction of the language of Art. 113 (b)-1 is not justified. Had such meaning been intended it would have been a simple matter to express it clearly. Such construction is, we think, strained and unreal and in direct conflict with the specific direction of the preceding section which provides that the basis shall be adjusted as under the Regulations for 1933 and *161 this figure taken for 1934. The figure for 1933 would certainly not reflect the losses taken advantage of. The Jordahl case is squarely in point on that. Respondent relies on G.C.M. 7765, C.B. IX-1, p. 223, G.C.M. 11676, C.B. XII-1, p. 75, and G.C.M. 12581, C.B. XIII-1, p. 142. It is claimed that all three direct that in computing gain from the sale or other disposition of stock of a subsidiary that the cost basis of the parent be adjusted by reason of losses of such subsidiary taken credit for in prior years. It is overlooked that in the case of each of the G. C. M.'s cited the rule is stated as that applying to a case where the subsidiary is either liquidated or its stock sold by the parent to some outsider. We agree with the petitioner's computation of its gain upon the redemption of the preferred stock as being in the sum of $600,000. The petitioner nas abandoned its issue of the application of the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (k) Bad Debts. - Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
2. Sec. 201 (d), Revenue Act of 1921; Sec. 115 (f), Revenue Act of 1928.↩
3. 1938, Vol. 1, C.B., p. 17.↩